51 P.3d 800 (2002)
112 Wash.App. 729
In the Matter of the Determination of the Rights to the Use of the Surface Waters of the Yakima River Drainage Basin, in Accordance with the Provisions of Chapter 90.03 Revised Code of Washington.
The STATE of Washington, DEPARTMENT OF ECOLOGY, Respondent,
v.
James J. ACQUAVELLA, et al., Defendants,
U.S. Timberlands Yakima, L.L.C., Appellant,
Confederated Tribes and Bands of the Yakama Nation, Respondent.
No. 20022-1-III.
Court of Appeals of Washington, Division 3, Panel Eight.
August 1, 2002.
*802 Charles B. Roe, Jr., Philip T. McDonald, Perkins, Coie, Olympia, WA, James R. Johnston, Perkins, Coie, Seattle, WA, for Appellant.
Alan M. Reichman, Assistant Attorney General, Olympia, WA, Jeffrey S. Schuster, Seattle, WA, for Respondent.
*801 SWEENEY, J.
This is a water rights case. But the resolution turns on the application of the doctrine of res judicata. In the water rights adjudication here, the trial court confirmed the denial of water rights claims based on the failure of the claimant's predecessor to assert the water rights in a 1921 water adjudication. We agree with the referee and the trial judge that the water rights claimed here appear no where in the 1921 decree. And the effect of this omission is to preclude the claimant from asserting these rights in this later adjudication. We therefore affirm the judgment of the trial court, which affirmed the referee's recommendation that the water rights claims be denied.

I. FACTS
The facts of this case only make sense when considered against the backdrop of water law in this state. And so we begin with a review of that law.
A. THE STATUTORY CONTEXT OF ECOLOGY'S ACTION.
Washington enacted a Water Code in 1917. It provides in part that: "Subject to existing rights all waters within the state belong to the public, and any right thereto ... shall be hereafter acquired only by appropriation ... in the manner provided...." RCW 90.03.010 (emphasis added). The "manner provided" is the permit system set out in RCW 90.03.250.340.
B. PRE-EXISTING COMMON LAW RIGHTS TO WATER.
The phrase, "subject to existing rights," refers to water rights acquired before 1917. Before 1917 the government did not regulate waterat least legislatively. Instead, the courts recognized water rights under traditional common law concepts of riparian rights and prior appropriation. See Benton v. Johncox, 17 Wash. 277, 49 P. 495 (1897); In re Determination of Right to Use of Waters of Doan Creek, 125 Wash. 14, 215 P. 343 (1923), overruled in part by In re Determination of Rights to Use of Waters of Stranger Creek, 77 Wash.2d 649, 466 P.2d 508 (1970). Riparian rights follow ownership of the real property, underlying or bordering a waterway. Crook v. Hewitt, 4 Wash. 749, 750-51, 31 P. 28 (1892). Prior appropriation rewards all who diverted water from a natural watercourse or water body and applied it to a beneficial use. See Hunter Land Co. v. Laugenour, 140 Wash. 558, 250 P. 41 (1926).
*803 In Department of Ecology v. Abbott, the court acknowledged that riparian owners who had not yet utilized their right to use water should not be immediately barred from doing so by passage of the 1917 water act. Dep't of Ecology v. Abbott, 103 Wash.2d 686, 697, 694 P.2d 1071 (1985). The court held that riparian owners had to be given adequate time to learn about the 1917 Water Code. And they had to be given time to protect water rights by putting the water to a beneficial use. The Abbott court held that 15 years was an adequate time period to accomplish this. Id. at 695-96, 694 P.2d 1071. Previously unexercised riparian rights could therefore be put to beneficial use and thereby preserved through the year 1932. After 1932, any new water diversions would require a state permit. Id.
C. GENERAL ADJUDICATION OF WATER RIGHTS.
This case involves a general adjudication of water rights started by the Department of Ecology pursuant to RCW 90.03.110 (Acquavella litigation). Under Washington's Water Code, a general adjudication of water rights in a drainage area may be sought by Ecology if it believes the "interest of the public will be subserved" by a determination of such rights. RCW 90.03.110. An adjudication is triggered when Ecology files in superior court a "statement of facts" and a plan or map of the "locality under investigation." RCW 90.03.110. The superior court then enters an order directing the issuance of a summons containing a brief statement of the object and purpose of the proceedings. The clerk of court issues a summons against all persons, known and unknown, claiming a right to divert the water. That summons directs all interested parties to file a statement of claim of water right. RCW 90.03.120.
After service, the superior court refers the matter to Ecology to take evidence before a referee. RCW 90.03.160, .170. The referee files a transcript of the testimony with the superior court, together with recommendations as to each claim. RCW 90.03.190. Following the report of the referee, the court holds a hearing to consider the parties' written exceptions to the report. RCW 90.03.200. See also VII WASH. STATE BAR ASS'N, REAL PROPERTY DESKBOOK § 117.5 (1996). The court then either adopts the referee's report, accepts it with modifications, or rejects it, and enters a final order determining the parties' rights to water in the locality.
D. SUPERIOR COURT PROCEEDINGS IN THIS GENERAL ADJUDICATION (ACQUAVELLA).
The general adjudication the Department of Ecology prosecuted here concerned the water of the Yakima Basin, which includes the Teanaway River. But the water rights in some of the areas within the Yakima Basin, including the Teanaway River, had been the subject of earlier adjudications. One of those was the 1921 Amosso litigation. That adjudication culminated in a decree declaring various water rights in the Teanaway River.
The superior court in this action ordered that if a prior action involving a waterway "was designed and intended as a general adjudication of the rights of all parties on a particular stream or tributary, any water rights not mentioned in the decree were extinguished." Clerk's Papers (CP) at 500[1] (Order Re: Res Judicata Motions, filed Sept. 6, 1985) (citing McLeary v. Dep't of Game, 91 Wash.2d 647, 652, 591 P.2d 778 (1979)). The order also stated that "in such an action, the final judgment or decree will conclude the parties as to any rights which might have been claimed, but were not asserted." CP at 501 (citing Nevada v. United States, 463 U.S. 110, 129-30, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983)).
1. History of Use.
Boise Cascade Corporation (immediate predecessor in interest of U.S. Timberlands Yakima LLC) filed its statement of claim in this action on September 1, 1981. It claimed "an existing ... beneficial use of certain surface waters ... for industrial, domestic, *804 stock watering, road construction and maintenance, dust abatement, and fire control and suppression purposes" based upon both prior appropriation and riparian rights. CP at 466-67.
Boise Cascade presented evidence that its predecessor (Cascade Lumber Co.) harvested timber in the Teanaway River Basin beginning in the 1880s. Report of Proceedings (RP) (Aug. 23, 1991) at 9-10. In 1903, Cascade Lumber acquired a substantial block of the timberlands in the Teanaway Basin. Exs. DE-219, DE-220. At first, logs were floated down the river to sawmills. Later, steam powered railcars transported logs to the mills. Those railcars also required a considerable amount of water. The railroad drew water from the Teanaway River and its tributaries at a number of withdrawal points. "Track walkers" also patrolled the railroad tracks on foot in search of fires caused by locomotives. RP (Aug. 23, 1991) at 19. They drew water from the river and tributaries to put out these fires. By 1930, the old growth timber had been logged. But timber harvest in the Teanaway River Basin resumed following regrowth of commercially marketable timber in the sub-basin.
At the present time, logs are moved out of the area over roads built to replace the former tracks. Road surfaces deteriorate without water. And so Timberlands applies water daily when hauling logs.
2. Present Claims.
Boise Cascade claimed the right to divert water for its timber management purposes at 10 points within the 48,000 acres it owns in the Teanaway sub-basin.
On January 25, 1996, the referee reported: "The rights to the use of waters of the Teanaway River and its tributaries have previously been determined in the case of State of Washington v. Frank Amosso and Minnie Amosso, his wife; et al. (hereinafter Amosso), with a decree entered in Kittitas County Superior Court [No. 6221] on June 16, 1921." CP at 263. He found that:
Water Rights Claims were filed pursuant to RCW 90.14 for use of those sources for stock water, fire protection and road maintenance. Review of the Amosso decree from the 1921 adjudication does not reveal... any water rights confirmed for timber harvesting.... Except for de minimis stock watering and domestic supply uses, which were addressed only generally in the prior adjudication, the Referee has not recommended that water rights be confirmed in this proceeding, if there is not a specific right from the 1921 adjudication.
CP at 300-2. Boise Cascade filed a statement of exceptions to the referee's report on April 5, 1996. The referee filed a supplemental report on March 29, 1999. And Boise Cascade excepted to it.
3. Court's Ruling.
On July 29, 1999, the superior court ruled, "[a]s to the request of Boise Cascade for additional points of diversion, it shall apply to [Ecology] for changes in points of diversion per R.C.W. 90.03.280, inasmuch as the Court holds that the Amosso decree was a general adjudication and Boise Cascade is limited to the rights awarded therein." CP at 35. The referee filed a second supplemental report. Boise Cascade again excepted. The superior court by order confirmed the referee's report and held that "[a]ll claims to water rights before the Referee ... not so confirmed are denied." CP at 7. Timberlands appeals this order.
E. THE AMOSSO DECREE.
The state hydraulic engineer set in motion the prior 1921 Amosso adjudication "to determine the rights to the waters of [the Teanaway River]." Ex. DE-237 (1921 Report of Referee) at 1. The 1917 Water Code provided in part that:
Upon the filing of a petition with the state hydraulic engineer by ... persons claiming the right to divert any waters ..., it shall be the duty of the state hydraulic engineer to prepare a statement of the facts, together with a plan or map of the locality under investigation, and file such statement and plan or map in the superior court....
Laws of 1917, ch. 117, § 14. The code also provided that:

*805 Whenever proceedings shall be instituted for the determination of the rights to the use of water, any defendant who shall fail to appear in such proceedings ... and submit proof of his claim, shall be estopped from subsequently asserting any right to the use of such water embraced in such proceeding....
Laws of 1917, ch. 117, § 24. The language of these sections is essentially the same as that used in today's Water Code. See RCW 90.03.110 and .220.
The Amosso decree held: "That the parties hereto and their successors in interest be and they hereby are entitled to divert from the Teanaway River and its tributaries the amount of water specified in the classification hereinafter set forth for beneficial use upon their several lands described therein...." Ex. DE-45 at 1-2. The decree also provided "[t]hat all waters in excess of the total amount apportioned and decreed to the several tracts of land described in the classification, belong to the public and are subject to appropriation." Ex. DE-45 at 2 (emphasis added).
The decree's ownership list included Cascade Lumber, Boise Cascade's and Timberlands' predecessor, but did not include the right to divert water at the 10 points that Timberlands claims in this Acquavella adjudication. Ex. DE-237. Those diversion points (identified by their section, township, and range in Ex. DE-222) fall within the Teanaway River Basin.

II. DISCUSSION
A. CONTENTIONS AND ISSUES. The first question here is whether the 1921 Amosso decree is a general adjudication of all water rights in the Teanaway River Basin. If it is, the decree would then bar (on res judicata principles) any claim by U.S. Timberlands to water rights not confirmed in that decree.
Timberlands argues that the 1921 adjudication covered only lands then under irrigation from the Teanaway River. Appellant's Br. at 28-34. It bases this claim on language in that decree which refers to "irrigable land," water "diverted for irrigation," and "the irrigation season." Ex. DE-45 at 2, 6. Timberlands also directs our attention to the "Certificates of Water Rights" issued pursuant to the Amosso decree. The certificates were preprinted forms that stated that the named party "is entitled to use ... the waters of said [Teanaway River] for the purpose of irrigation during the period [date]." Ex. SE-4. It notes that under the heading of "Area of Lands Involved," the 1921 report of referee listed 32 farms covering 3,200 acres and also listed 2,000 acres that were irrigable. Ex. DE-237 at 4. And the decree tied each right to a specified acreage of "irrigable land" when identifying water rights confirmed. Ex. DE-45 at 2-6. Timberlands points out that most of those rights were for land outside of the forested 48,000 acres that Timberlands owns. Finally, Timberlands argues that a construction of the Amosso adjudication as one that was limited to irrigation rights is consistent with the common understanding at that time that the 1917 Water Code addressed only conflicting irrigation rights.
B. RES JUDICATA.
RCW 90.03.220 provides that
[w]henever proceedings shall be instituted for the determination of the rights to the use of water, any defendant who shall fail to appear in such proceedings, after legal service, and submit proof of his claim, shall be estopped from subsequently asserting any right to the use of such water embraced in such proceeding, except as determined by such decree.
Thus, RCW 90.03.220 memorializes by statute the application of the doctrine of res judicata to water adjudications. The bar of res judicata requires identity of action, subject matter, and parties. See Mellor v. Chamberlin, 100 Wash.2d 643, 645, 673 P.2d 610 (1983).
Here, the language of both the Amosso referee's report and the court's later decree indicates that the Amosso litigation encompasses more than Timberlands suggests. The referee reported that the 1921 adjudication was instituted "to determine the rights to the waters of [the Teanaway River]." Ex. *806 DE-237, at 1. The map attached to the referee's report was not limited to farmlands of the claimants seeking water rights for irrigation. And, the decree specifically provided that "waters in excess of the total amount apportioned ... belong[ed] to the public and [were] subject to appropriation." Ex. DE-45 at 2. Indeed, water rights for property beyond that set out in the referee's maps were confirmed by the 1921 Amosso decree. Ex. DE-45.
We found no case directly on point. But McLeary v. Department of Game is a helpful parallel. McLeary v. Dep't of Game, 91 Wash.2d 647, 591 P.2d 778 (1979). There, a downstream owner asked the court to enjoin the Department of Game from establishing a fish hatchery without a permit from the Department of Ecology. The stream had been the subject of a 1924 general water rights adjudication. In that adjudication, the Department of Game's predecessor filed a statement claiming riparian water rights for a fish hatchery. Its petition was denied. A fish hatchery was nonetheless operated on the property for nearly 40 years without a permit. The Department of Game purchased the property in 1971 to reopen and expand that fish hatchery. But the Department's operation would have adversely impacted a downstream owner who was conducting his own fish hatchery business, pursuant to a permit. Id. at 648-49, 591 P.2d 778. In opposing the downstream owner's request for an injunction, the Department of Game argued that "the `nonconsumptive' right to use creek waters for fish hatchery purposes, as contrasted to water use for irrigation purposes, [were] ... preexisting rights which survive[d] the 1924 decree." Id. at 651, 591 P.2d 778.
The court rejected the argument. It held instead that "a narrow construction of the nature of rights settled in an adjudication would serve no purpose." Id. And "`[t]aking the water code as a whole, its very purpose is to settle and determine all rights and priorities to the use of the water under investigation. By its terms, the judgment is designed to be a final adjudication of the rights of all parties.'" Id. (quoting Wilson v. Angelo, 176 Wash. 157, 160, 28 P.2d 276 (1934)).[2] The court further commented that "[w]hatever the description of a right [as consumptive or nonconsumptive], it is subject to confirmation in the general adjudication procedure provided in RCW 90.03.110 et seq." Id. Necessarily then, the court "decline[d] to take any step which would diminish the scope of the rights affected by this procedure." Id. The court concluded that any rights not asserted in the 1924 decree were extinguished. And, because the decree did not mention a water right for fish hatchery uses, that right was extinguished. Id.
Here, unlike McLeary, Timberlands' predecessor made no claim in the Amosso adjudication for the water rights it now seeks. McLeary's reasoning is nonetheless applicable here. Whether a water rights claim was denied or whether it was never made does not change the final and general nature of an adjudication under the Water Code. RCW 90.03.220. To hold otherwise would undercut the scope of both the existing rights recognized by the adjudication and those later rights acquired by permit. See McLeary, 91 Wash.2d at 651, 591 P.2d 778.
C. CLAIMS NOT ADJUDICATED IN PRIOR ACTION.
In concluding that claims not asserted in the 1921 adjudication were barred, the trial judge in this case relied on Nevada v. United States.[3] There, the United States sued (in 1913) to adjudicate water rights to the Truckee River in Nevada for the benefit of the Pyramid Lake Indian Reservation. In a 1973 suit, the United States prayed for additional water rights. The court held the latter action was the same cause of action addressed in the 1913 adjudication, and therefore barred on res judicata principles. Specifically, the first action was "`a finality as to the claim or demand in controversy, concluding *807 parties and those in privity with them, not only as to every matter which was offered ..., but as to any other admissible matter which might have been offered for that purpose.'" Nevada v. United States, 463 U.S. 110, 129-30, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983) (emphasis added) (quoting Cromwell v. County of Sac, 94 U.S. 351, 352, 24 L.Ed. 195 (1876)).
Timberlands nevertheless argues that "res judicata does not bar litigation of claims that were not in fact adjudicated in the prior case." Reply Br. at 14. It relies on In re Determination of Rights to Use of Surface Waters of Yakima River Drainage Basin[4] and Seattle-First National Bank v. Kawachi.[5] The court in Yakima River cited Kawachi for the proposition that "[a] prior judgment is res judicata as to every question which was properly a part of the matter adjudicated, but it does not bar litigation of claims which were not in fact adjudicated." In re Determination of Rights to Use of Surface Waters of Yakima River Drainage Basin, 121 Wash.2d 257, 290, 850 P.2d 1306 (1993).
The actual language from Kawachi is a bit different, however. What the court actually said was:
While it is often said that a judgment is res judicata of every matter which could and should have been litigated in the action, this statement must not be understood to mean that a plaintiff must join every cause of action which is joinable when he brings a suit against a given defendant. CR 18(a) permits joinder of claims. It does not require such joinder. And the rule is universal that a judgment upon one cause of action does not bar suit upon another cause which is independent of the cause which was adjudicated. A judgment is res judicata as to every question which was properly a part of the matter in controversy, but it does not bar litigation of claims which were not in fact adjudicated.
Seattle-First Nat'l Bank v. Kawachi, 91 Wash.2d 223, 226, 588 P.2d 725 (1978) (citations omitted) (emphasis added). Thus, res judicata bars claims which were "properly a part of the matter in controversy," but does not bar every claim the plaintiff could have joined. Id.
Here, the water rights claims of Boise Cascade's predecessor were "properly a part of the matter in controversy"specifically the determination of rights to surface water in the Teanaway River Basin. Its claims were not simply a matter of permissive joinder. Boise Cascade's predecessor had to assert them. Or they were barred. RCW 90.03.220.
D. RCW 90.03.245RIGHTS SUBJECT TO DETERMINATION.
Timberlands next argues that water rights adjudications prior to 1979 were not general adjudications. It relies on the following language in RCW 90.03.245: "Rights subject to determination proceedings conducted under RCW 90.03.110 through 90.03.240 ... include all rights to the use of water, including all diversionary and instream water rights, and include rights to the use of water claimed by the United States." The Legislature added that statute to the Water Code in 1979.
Timberlands cites the presumption that "[t]he Legislature is presumed not to pass meaningless legislation, and in enacting an amending statute, a presumption exists that a change was intended." Spokane County Health Dist. v. Brockett, 120 Wash.2d 140, 154, 839 P.2d 324 (1992). So viewed, Timberlands argues that the statute indicates that prior to 1979, water rights adjudications did not include all water rights in a stream. Timberlands reasons then that the 1921 Amosso adjudication, although conducted pursuant to the statutory predecessor to RCW 90.03.110, was not a general adjudication.
Now, certainly, not every change in a statute is amendatory; some just clarify existing law. City of Des Moines v. Puget Sound Reg'l Council, 108 Wash.App. 836, 845, 988 P.2d 27 (1999). Here, Timberlands *808 asserts in its opening brief at page 44 that RCW 90.03.245 "followed from the efforts, including the passage of the McCarran Amendment, to join all possible claimants in a general adjudication of water from a particular source." (Emphasis added.)
Congress passed the McCarran Amendment[6] in 1952 and waived sovereign immunity, but only as to general water rights adjudications. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); see also Dep't of Ecology v. Acquavella, 100 Wash.2d 651, 654, 674 P.2d 160 (1983). Timberlands is correct that the enactment of RCW 90.03.245 must be viewed against the backdrop of the McCarran Amendment, and the United States Supreme Court decisions construing it. But its conclusion that this history shows that, prior to enactment of the McCarran Amendment, water adjudications under RCW 90.03.110 were not general adjudications is wrong. The language of RCW 90.03.110 et seq. that sets forth the process for determining water rights remained essentially the same beginning with the original 1917 code. In 1934 the Washington State Supreme Court said "[t]aking the water code as a whole, its very purpose is to settle and determine all rights and priorities to the use of the water under investigation." Wilson, 176 Wash. at 160, 28 P.2d 276. The Legislature, when it enacted RCW 90.03.245, simply made clear that water rights adjudications in Washington were general adjudications and, as such, could determine federal water rights, following the McCarran Amendment.
E. EXCEPTIONS TO RES JUDICATA/INJUSTICE.
Timberlands argues that application of res judicata would be unjust because the water is necessary for timber management purposes. And Timberlands and its predecessors have continuously used the water for those purposes. The amount claimed is de minimis. Further, Timberlands asserts that its predecessor would have claimed the water rights if it had known the 1921 adjudication was a general adjudication.
There are exceptions to the strict application of res judicata. But they are limited.[7] Here, all of the requirements of res judicata have been met. And Timberlands' complaints do not suggest fraud or a breach of some fundamental public policy. See Kingery v. Dep't of Labor & Indus., 132 Wash.2d 162, 169, 937 P.2d 565 (1997) ("[a]n unappealed Department [of Labor and Industries] order is res judicata as to the issues encompassed within the terms of the order, absent fraud in the entry of the order"); In re Di Carlo's Estate, 3 Cal.2d 225, 235, 44 P.2d 562 (1935) (res judicata "is not to be applied so rigidly as to defeat the ends of justice; there are exceptions to it, based upon important reasons of policy"). Moreover, we find here none of the potential procedural conundrums which would militate in favor of a conclusion that the result is unjust. See Philip A. Trautman, Claim and Issue Preclusion in Civil Litigation in Washington, 60 WASH. L.REV. 805, 826-29 (1985). We conclude, then, that the application of res judicata does not work an injustice here.
F. RIPARIAN RIGHTS.
The next question is whether Timberlands' predecessor "revived" a water right by exercising riparian rights following entry of the Amosso decree but prior to 1932.
Timberlands urges that its predecessors were riparian owners who put the water to beneficial use before 1932. Remember, the year "1932" is significant because the court in Abbott stated that riparian owners had a reasonable time after passage of the 1917 water act to perfect riparian rights by putting that water to a beneficial use. Dep't *809 of Ecology v. Abbott, 103 Wash.2d 686, 695, 694 P.2d 1071 (1985). The court held that 15 years was a reasonable timeby 1932. Timberlands argues that its predecessors beneficially used the water in question before 1932. Ecology agrees that Timberlands has perfected riparian rights. But it argues that Timberlands' priority date is junior to the rights confirmed in the Amosso decree. We disagree with both positions.
The water rights claimed in Abbott had not been the subject of a prior adjudication of water rights in a drainage area. And this is an important distinction. Here, the 1921 Amosso decree fully adjudicated water rights in the Teanaway River Basin. And, the 1917 Water Code specifically provides that rights not claimed in an adjudication are extinguished. RCW 90.03.220.
Again, the McLeary case is helpful:
[The Department of Game's] contention is that through [its predecessor's] use of the water for a commercial fish hatchery since 1945, the necessary elements of a prescriptive claim were established. [But, t]he 1924 decree is a barrier to this claim. Its effect was to transfer to the state, for management through the appropriation permit procedure, those rights not otherwise allocated in the decree. Adverse possession may not be acquired against the state.

McLeary v. Dep't of Game, 91 Wash.2d 647, 652, 591 P.2d 778 (1979) (emphasis added), cited in Resp't's Br. at 11.
The 1924 decree in McLeary barred any subsequent claim of a riparian right. Similarly, the 1921 Amosso decree here bars any subsequent claim by Timberlands of a riparian right. The effect of the 1921 decree was to transfer to the state those rights not specifically allocated by the decree. See McLeary, 91 Wash.2d at 651, 591 P.2d 778.
Whether the owner put water to a beneficial use before or after 1932 is then immaterial. What is material is the Amosso decree. That decree did not allocate the water right now claimed and thereby transferred that water right to the state. And since there can be no adverse possession against the state, Timberlands' predecessor could not reacquire by beneficial use prior to 1932 a riparian right not allocated to it in the Amosso adjudication. See McLeary, 91 Wash.2d at 651-52, 591 P.2d 778.
Timberlands also relies on language in RCW 90.03.010 to support the assertion that its predecessor could exercise riparian rights if it did so before 1932. That section of the code provides that the Water Code is not to be construed to "lessen, enlarge, or modify" existing riparian rights. But that simply means that "[a]djudication proceedings cannot be used `to lessen, enlarge, or modify the existing rights of any riparian owner.'" In re Determination of Rights of Use of Surface & Ground Waters of Marshall Lake & Marshall Creek Drainage Basin, 121 Wash.2d 459, 477, 852 P.2d 1044 (1993) (emphasis added). None of that is happening here.
Timberlands' predecessor may well have had an existing, vested riparian right to the waterway that the 1921 adjudication would have had to recognize. But it had to be asserted. And, it was not asserted. RCW 90.03.010. Under RCW 90.03.220, Timberlands' predecessor lost that right when it was notified of the 1921 adjudication and failed to make a claim.
In sum, Abbott's holding that riparian owners had until 1932 to perfect their water rights is based upon the due process requirement that property cannot be taken without adequate notice. Abbott, 103 Wash.2d at 697, 694 P.2d 1071. The court in Abbott held as a matter of law that riparian owners had sufficient notice of the Water Code after the code had been in effect for 15 years. Id. at 695, 694 P.2d 1071. Here, the requirement of notice to Timberlands' predecessor was satisfied by the statutory notice, in 1921, of the general adjudication (RCW 90.03.120).
Timberlands' predecessor could not then "revive" a water right not allocated to it in the 1921 Amosso decree.
G. DUE PROCESS VIOLATION.
The next question here is whether the superior court's use of the Amosso decree to terminate Timberlands' water rights violated Timberlands' right to due process and impinged on some vested property interest in the beneficial use of the water. It did not.
As previously stated, Timberlands' predecessor, Cascade Lumber, had notice of the *810 1921 adjudication. Indeed, it claimed and was granted some water rights in that adjudication. And, as we have held, the 1921 Amosso adjudication was a general adjudication. Cascade Lumber's actual knowledge of that adjudication, therefore, satisfied due process requirements of notice.
H. EQUITABLE WATER RIGHT.
The final question presented is whether the superior court abused its discretion when it refused to exercise its equitable powers to confirm Timberlands' water rights. According to Timberlands,
the absence of a specific reference in the Amosso Decree should not be controlling given the overwhelming evidence that the water was being used for this purpose at the very time the adjudication was taking place. Water use for this purpose was well-recognized, it was de minimis in nature, and it is inconceivable that the Court, and certainly not the parties, would intend by the Amosso Decree to eliminate this usage.
CP at 245.
RCW 90.03.200 reads in pertinent part, that: "[I]f exceptions [to the report of Ecology's referee] are filed the action shall proceed as in case of reference of a suit in equity...." The statute is cited by the court in Marshall Lake, 121 Wash.2d at 465, 852 P.2d 1044, in support of the proposition that "[a]ppellate review of a decree in a general adjudication of water rights is to be made in the same manner as in other cases in equity."
We review a trial court's application of equity for an abuse of discretion. Willener v. Sweeting, 107 Wash.2d 388, 397, 730 P.2d 45 (1986). "`Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously.'" Lenhoff v. Birch Bay Real Estate, Inc., 22 Wash.App. 70, 74-75, 587 P.2d 1087 (1978) (quoting State ex rel. Carroll v. Junker, 79 Wash.2d 12, 26, 482 P.2d 775 (1971)).
Timberlands argues that the court in equity should have granted its claims because they involve a de minimis amount of water. Further, it urges that it makes no sense that its predecessor would have failed to make these claims if it believed that the 1921 adjudication concerned such rights. These are not typically equitable grounds. Nor are they compelling. None rise to the level of equitable estoppel or laches, a show of bad faith, or concealment or fraud. See Willener, 107 Wash.2d at 396-97, 730 P.2d 45; Hartman v. Smith, 100 Wash.2d 766, 769, 674 P.2d 176 (1984); In re Marriage of Watkins, 42 Wash.App. 371, 374, 710 P.2d 819 (1985). And even if they did the superior court would have had to balance them against the interests of the state, and other water users. Those users had the right to rely upon the 1921 Amosso decree as a final adjudication of pre-existing water rights in the area.
Timberlands also asserts that the court recognized the rights of some other claimants who had not had their rights certified in the Amosso decree. It cites as an example, a claim by George Blackburn. The court initially disagreed with the referee's recommendation to deny Mr. Blackburn's claims because it involved a spring. Ultimately, however, the water right was denied. The other example citedJane Shawappears to have been based upon a 1914 notice of water appropriation.
Timberlands' argument here is in the nature of an equal protection claim. And, of course, we pass upon individual exercises of discretion by reviewing whether tenable reasons support each decision. Carroll, 79 Wash.2d at 26, 482 P.2d 775. We hold that the trial court did not abuse its discretion by refusing to recognize Timberlands' rights not claimed and confirmed in 1921.

III. CONCLUSION
We affirm the judgment of the superior court denying Timberlands' water rights claim.
WE CONCUR: BROWN, C.J., KURTZ, J.
NOTES
[1] The specific quoted language is set out in the court's Memorandum Opinion: Re Res Judicata Motions, which is incorporated into the Order Re: Res Judicata Motions by reference. CP at 496.
[2] The McLeary court also cited Thompson v. Short, 6 Wash.2d 71, 87-88, 106 P.2d 720 (1940), and Frank J. Trelease, Coordination of Riparian and Appropriative Rights to the Use of Water, 33 TEX. L.REV. 24, 59 (1954).
[3] 463 U.S. 110, 103 S.Ct. 2906, 77 L.Ed.2d 509 (1983).
[4] 121 Wash.2d 257, 850 P.2d 1306 (1993).
[5] 91 Wash.2d 223, 588 P.2d 725 (1978).
[6] 43 U.S.C. § 666 (1976).
[7] The exception for injustice is more liberally applied to the doctrine of collateral estoppel (issue preclusion). See Kennedy v. City of Seattle, 94 Wash.2d 376, 378-79, 617 P.2d 713 (1980); Henderson v. Bardahl Int'l Corp., 72 Wash.2d 109, 115, 431 P.2d 961 (1967); Luisi Truck Lines, Inc. v. Util. & Transp. Comm'n, 72 Wash.2d 887, 894, 435 P.2d 654 (1967); In re Marriage of Murphy, 90 Wash.App. 488, 498, 952 P.2d 624 (1998). Indeed, relitigation of an issue is barred on the basis of collateral estoppel only if it does not work an injustice on the party against whom the doctrine is to be applied. State ex rel. Dean v. Dean, 56 Wash.App. 377, 380, 783 P.2d 1099 (1989).